CASE NO. 23-10170

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

## PAYCARGO, LLC

Plaintiff-Appellee,

v.

## CARGOSPRINT LLC, and JOSHUA WOLF,

Defendants-Appellants.

---

On Appeal from a Final Judgment of the United States District Court
For The Southern District of Florida, and Order Granting Partial Summary
Judgment

---

## INITIAL BRIEF OF APPELLANTS

---

URY FISCHER
NOAH H. RASHKIND
GIULIA C. FARRIOR
DYLAN H. SMITH
**LOTT & FISCHER, PL**
255 ARAGON AVENUE
THIRD FLOOR
CORAL GABLES, FLORIDA 33134
(305) 448-7089

**Counsel for Appellants**

PayCargo, LLC v. CargoSprint LLC, et al., 23-10170

## CERTIFICATE OF INTERESTED PARTIES
## AND CORPORATE DISCLOSURE STATEMENT

Appellants file this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1:

Wolf, Joshua (Defendant-Appellant)

CargoSprint LLC (Plaintiff-Appellee)

Fischer, Ury (Appellate Counsel for Defendants-Appellants)

Rashkind, Noah H. (Appellate Counsel for Defendants-Appellants)

Lott & Fischer, P.L. (Appellate Counsel for Defendants-Appellants)

Farrior, Giulia C. (Appellate Counsel for Defendants-Appellants)

Smith, Dylan H. (Appellate Counsel for Defendants-Appellants)

Moreno, Judge Federico A. (District Judge)

Louis, Magistrate Judge Lauren F. (Magistrate Judge)

PayCargo, LLC (Plaintiff-Appellee)

Prieto, Peter (Counsel for Plaintiff-Appellee)

Weinshall, Matthew (Counsel for Plaintiff-Appellee)

Del Riego, Alissa (Counsel for Plaintiff-Appellee)

Weber, Jason (Counsel for Plaintiff-Appellee)

Atkins, Wayne (Counsel for Plaintiff-Appellee)

Fort, Ann (Counsel for Plaintiff-Appellee)

PayCargo, LLC v. CargoSprint LLC, et al., 23-10170

Podhurst Orseck, P.A. (Counsel for Plaintiff-Appellee)

Xander Law Group, P.A. (Counsel for Plaintiff-Appellee)

Eversheds Sutherland LLC (Counsel for Plaintiff-Appellee)

CargoSprint LLC certifies that it is not publicly traded, has no parent corporations, and that no publicly held entity owns 10% or more of its stock.


s/ Noah H. Rashkind
Noah H. Rashkind

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully submit that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision-making process.

## **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE
  DISCLOSURE STATEMENT ..................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ..................................................i

TABLE OF AUTHORITIES ....................................................................................iv

STATEMENT OF JURISDICTION..................................................................... viii

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................1

STATEMENT OF THE CASE...................................................................................2

　　Course of Proceedings and Disposition in the District Court ........................2

　　Statement of Facts Relevant to Appeal ...........................................................3

　　The District Court's Findings, Trial Order and Final Judgment ....................6

　　　i.　　Genericism ........................................................................................6

　　　ii.　Ownership Rights in the PayCargo Marks.....................................7

　　　iii.　Fraud................................................................................................10

　　　iv.　Trial .................................................................................................13

STANDARDS OF REVIEW ...................................................................................16

SUMMARY OF THE ARGUMENT ......................................................................18

ARGUMENT ..........................................................................................................21

　　I.　　The Lower Court Weighing of the Evidence Precludes
　　　　　Summary Judgment..........................................................................21

　　　　A.　　Genericism .................................................................................22

　　　　B.　　Lack of Ownership Precludes Summary Judgment.................29

　　　　　　i.　　'112 Registration and '315 Registration (Counts
　　　　　　　　　I and III)..........................................................................29

　　　　　　ii.　'069 Registration (Count II) ...........................................33

　　　　C.　　Fraud on the USPTO Precludes Summary Judgment..............35

i.      '112 Registration and '315 Registration (Counts I and III) ............................................................................36

ii.     Incontestable Status of '315 Registration (Count III) ....................................................................................40

iii.    '069 Registration (Count II) ...........................................41

iv.    Appellee's Breach of Contract Claim (Count IV) is also Barred ........................................................42

        1.     Count IV is Barred, In Part, by the Equitable Doctrines of Acquiescence and Estoppel ...............................................................42

        2.     Count IV is Barred, In Part, by Accord and Satisfaction ...................................................44

        3.     Appellee's Breach of Contract Claim in Count IV is Barred by Fraudulent Misrepresentation ...............................................46

II.     The Lower Court Should Have Admitted Evidence at Trial of Costs and Expenses ...........................................................47

III.    This Case is Not "Exceptional." ........................................................50

CONCLUSION ........................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Air Products & Chem., Inc. v. La. Land & Expl. Co.,*
   806 F.2d 1524 (11th Cir. 1986) ......................................................44

*Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.,*
   522 F.3d 1200 (11th Cir. 2008) ....................................................35

*Aycock Eng'g, Inc. v. Airflite, Inc.,*
   560 F.3d 1350 (Fed. Cir. 2009) ....................................................41

*Butler v. Yusem,*
   44 So. 3d 102 (Fla. 2010) ............................................................46

*Chudasama v. Mazda Motor Corp.,*
   123 F.3d 1353 (11th Cir. 1997) ........................................... 17, 47

*Colt Def. LLC v. Bushmaster Firearms, Inc.,*
   486 F.3d 701 (1st Cir. 2007).........................................................23

*Cortes v. Am. Airlines, Inc.,*
   177 F.3d 1272 (11th Cir. 1999) ........................................... 17, 47

*Domond v. PeopleNetwork APS,*
   No. 17-15576,2018 WL 4519930 (11th Cir. Sept. 20, 2018)................ 18, 50

*Ford Motor Co. v. O.E. Wheel Distribs., LLC,*
   868 F. Supp. 2d 1350 (M.D. Fla. 2012) ......................................43

*Frehling Enters. v. Int'l Select Group, Inc.,*
   192 F.3d 1330 (11th Cir. 1999) ....................................................41

*Gay Toys, Inc. v. McDonald's Corp.,*
   582 F.2d 1067 (CCPA 1978) ........................................................41

*Harley-Davidson, Inc. v. Grottanelli,*
   164 F.3d 806 (2d Cir.1999) ................................................. 23, 26

*In re Bose Corp.,*
   580 F.3d 1240 (Fed. Cir. 2009) ...................................................36

*Klayman v. Freedom's Watch, Inc.,*
   765 F. Supp. 2d 1348 (S.D. Fla. 2008)........................................23

*Liquid Controls Corp. v. Liquid Control Corp.*,
    802 F.2d 934 (7th Cir. 1986) ........................................................... 23, 24, 28

*Loglan Inst. v. Logical Language Grp., Inc.*,
    962 F.2d 1038 (Fed. Cir. 1992) ....................................................23

*Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab.*,
    859 F.3d 1023 (Fed. Cir. 2017) ....................................................34

*Metro Traffic Control, Inc. v. Shadow Network Inc.*,
    104 F.3d 336 (Fed. Cir. 1997) ....................................................35

*Nartron Corp. v. STMicroelectronics, Inc.*,
    305 F.3d 397 (6th Cir. 2002) ......................................................23

*Nationstar Mortg. LLC v. Ahmad*,
    112 U.S.P.Q.2d 1361 (T.T.A.B. Sept. 30, 2014)................................... 36, 39

*OJ Commerce, LLC v. KidKraft, Inc.*,
    34 F.4th 1232 (11th Cir. 2022) ............................................... 16, 17

*Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*,
    703 F. Supp. 2d 1307 (S.D. Fla. 2010)..........................................42

*Park 'n Fly v. Dollar Park & Fly*,
    469 U.S. 189 (1985)..................................................................23

*Playnation Play Sys. v. Velex Corp.*,
    859 F.'App'x 384 (11th Cir. 2021) ....................................... 17, 47

*PODS Enters. v. U-Haul Int'l., Inc.*,
    No. 8:12-cv-01479-T-27MAP, 2015 U.S. Dist. LEXIS 29849
    (M.D. Fla. Mar. 11, 2015) .........................................................24

*Robinson v. Liberty Mut. Ins. Co.*,
    958 F.3d 1137 (11th Cir. 2020) ..................................................24

*SourceTrack LLC v. Ariba, Inc.*,
    958 So. 2d 523 (Fla. App. 2007) ................................................43

*Sovereign Military Hospitaller Order of St. John of of Rhodes & Malta v.
    Fla. Priory of the Knights Hospitallers of Sovereign Order of St.
    John of Jerusalem, Knights of Malta, the Ecumeni*cal Order,
    702 F.3d 1279 (11th Cir. 2012) ................................................35

*Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*,
    293 F. Supp. 3d 1334 (M.D. Fla. 2017) ................................. 36, 39

*Study Edge, LLC v. Skoolers Tutoring Ctr., LLC*,
2017 U.S. Dist. LEXIS 216268 (N.D. Fla. Dec. 8, 2017) ............................29

*SunAmerica Corp. v. Sun Life Ins. Co. of Canada*,
77 F.3d 1325 (11th Cir. 1996) ........................................................42

*Tambourine Comercio Internacional SA v. Solowsky*,
312 F.'App'x 263 (11th Cir. 2009) ..................................................17

*Tobinick v. Novella*,
884 F.3d 1110 (11th Cir. 2018) ......................................... 1, 18, 50

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
505 U.S. 763 (1992).......................................................................22

*U.S. v. Smith*,
459 F.3d 1276 (11th Cir. 2006) ....................................................17

*United States PTO v. Booking.com B.V.*,
140 S. Ct. 2298 (2020)......................................................... *passim*

*Vencor Hosps. v. Blue Cross Blue Shield*,
169 F.3d 677 (11th Cir. 1999) ......................................................45

*Warrior Tombigbee Transp. Co. v. M/V Nan Fung*,
695 F.2d 1294 (11th Cir. 1983) ....................................................19

*Washington v. Howard*,
25 F.4th 891 (11th Cir. 2022) .......................................................16

*Welding Servs. v. Forman.*,
509 F.3d 1351 (11th Cir. 2007) ....................................................23

*Wright v. CSX Transp., Inc.*,
375 F.3d 1252 (11th Cir. 2004) ....................................................17

**Statutes & Other Authorities:**

15 U.S.C. § 1064(3) ...........................................................................22

15 U.S.C. § 1117(a) ...........................................................................47

37 C.F.R. § 2.34 (2021) .....................................................................39

37 C.F.R. § 2.71(d) ...........................................................................33

Fed. R. Civ. P. 65 ....................................................................... 20, 51

vi

Fed. R. Evid. 106 ................................................................................49

Fed. R. Evid. 201 ................................................................................24

10 Fla. Jur.2d *Compromise, Accord, and Release* § 1 (1979) ..................................45

McCarthy on Trademarks and Unfair Competition § 18:2 (5th ed.) ......................33

Trademark Manual of Examining Procedure  § 803.06 ..........................................34

Trademark Manual of Examining Procedure  § 1201 ..............................................34

Trademark Manual of Examining Procedure  § 1201.02(b)...................................34

U.S. Patent No. 8,812,381 (the "'381 Patent") ......................................................6, 7

## STATEMENT OF JURISDICTION

Plaintiff-Appellee PayCargo, LLC ("PayCargo" or "Appellee") brought an action by way of a second amended complaint ("Second Amended Complaint") in the lower court, on June 2, 2020, against Defendants-Appellants (collectively, "CargoSprint" or "Appellants") arising from, as it applies to the issues on appeal, a dispute over the use of CargoSprint LLC's old company name, "PayAirCargo," Doc 100, pgs. 1-3. CargoSprint moved for partial summary judgment of the Second Amended Complaint ("CargoSprint's MSJ"), Doc 163, on April 2, 2021. PayCargo opposed CargoSprint's MSJ ("Response to CargoSprint's MSJ"), Doc 174, on April 16, 2021. CargoSprint filed their reply brief ("CargoSprint's Reply"), Doc 178, on April 23, 2021. The lower court denied CargoSprint's MSJ, in pertinent part, as to Count I – Infringement of United States Trademark Registration 3,519,112, Count II – Infringement of United Sates Trademark Registration 3,900,069, Count III – Infringement of United States Trademark Registration 3,347,315, Count IV - Breach of Contract (Settlement Agreement), and Count V – Federal Unfair Competition – False Designation of Origin. Doc 244.

PayCargo also brought a motion for partial summary judgment ("PayCargo's MSJ"), on April 2, 2021, Doc 164. CargoSprint timely opposed PayCargo's MSJ ("Response to PayCargo's MSJ"), Doc 172, and PayCargo filed its reply brief

("PayCargo's Reply"), Doc 186, on April 23, 2021. The lower court granted, in-part, PayCargo's MSJ on June 17, 2021 ("Order Granting PayCargo's MSJ"), Doc 267, as to Counts I, II, III, and V, and denied PayCargo's MSJ as to Counts IV and VI.

The lower court held a bench trial, from June 21 through 25, 2021, to determine liability as to Counts IV and VI, and to hear evidence with respect to damages. Doc 311 – 316. During trial, the lower court dismissed Count VI. The lower court heard closing arguments on July 22, 2021, Doc 308, and held a post-trial evidentiary hearing on April 21, 2022. Doc 352. Later that year, on September 30, 2022, the lower court issued its Findings of Fact and Conclusions of Law ("Trial Order"), Doc 354, and on December 16, 2022, issued its Final Judgment, Doc 366. On January 13, 2023, CargoSprint timely filed their Joint Notice of Appeal ("Notice of Appeal"). Doc 369.

The Court of Appeals has jurisdiction over this appeal pursuant to 28 U.S.C. §1294, which gives the courts of appeals jurisdiction over reviewable decisions of the district court for the circuit embracing the district.

## <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

**Issue Number One:**

Whether the District Court erred by granting PayCargo's Motion for Partial Summary Judgment, and denying CargoSprint's Motion for Partial Summary Judgment, when either genuine issues of material fact existed as to Counts I, II, III, IV, and V or, alternatively, when genuine issues of material fact did not exist, but when CargoSprint are the parties entitled to judgment as a matter of law?

**Issue Number Two:**

Whether the District Court erred by ordering $15,191,277.50 in damages, when it precluded CargoSprint from introducing into evidence bank records and/or a SalesForce database offered to show proof that payments for costs and expenses were actually made, when PayCargo had first introduced revenue evidence in its case-in-chief directly from the same SalesForce database that the lower court subsequently excluded?

**Issue Number Three:**

Whether the lower court erred by finding that this case is "exceptional," under the standard set forth in *Tobinick v. Novella*, 884 F.3d 1110 (11th Cir. 2018)?

## STATEMENT OF THE CASE

Defendants-Appellants CargoSprint LLC ("CS") and Joshua Wolf ("Wolf") are the defendants in the district court and will be referred to collectively as "CargoSprint" or "Appellants." Plaintiff-Appellee PayCargo, LLC is the plaintiff in the district court and will be referred to as "PayCargo" or "Appellee."

### Course of Proceedings and Disposition in the District Court

PayCargo brought an action in the lower court against CargoSprint arising from, as it applies to the issues on appeal, a trademark dispute over CargoSprint's use of the name "PayAirCargo" for cargo payment services. Doc 100. The "PayAirCargo" name quite literally describes the category of services CargoSprint offers to their customers, namely, a service that assists their customers to *pay air cargo* fees. Doc 100. CargoSprint filed their Motion for Partial Summary Judgment ("CargoSprint's MSJ"), Doc 163, on April 2, 2021, based on, *inter alia*, Appellee's non-ownership of the PayCargo trademark for myriad reasons, and on grounds that the PayCargo mark is generic for services that are offered to assist customers to "pay cargo" fees. PayCargo opposed CargoSprint's MSJ, Doc 174, on April 16, 2021, and CargoSprint filed their Reply brief, Doc 178, on April 23, 2021. PayCargo also filed its Motion for Partial Summary Judgment ("PayCargo's MSJ"), on April 2, 2021, Doc 164. CargoSprint timely filed its Response in Opposition to PayCargo's MSJ, Doc 172, and PayCargo filed its Reply, Doc 186,

2

on April 23, 2021. The lower court denied CargoSprint's MSJ, in pertinent part, as to Counts I, II, III, IV, and V, Doc 244, and granted PayCargo's MSJ, Doc 164, in-part, Doc 267, as to Counts I, II, III, and V, denying PayCargo's MSJ as to Counts IV and VI.

The lower court held a bench trial beginning June 21, 2021. Doc 279.  The lower court tried the issue of liability as to Counts IV and VI and heard evidence with respect to damages. Docs 311 – 316. The lower court heard closing arguments the following month, on July 22, 2021, Doc 308, and held an evidentiary hearing on April 21, 2022. Doc 352. Later that year, on September 30, 2022, the lower court issued its Findings of Fact and Conclusions of Law Order ("Trial Order"), Doc 354, and on December 16, 2022, issued its Final Judgment, Doc 366. On January 13, 2023, CargoSprint timely filed their Joint Notice of Appeal ("Notice of Appeal"). Doc 369.

This appeal follows.

### Statement of Facts Relevant to Appeal[1]

Two years before the commencement of the lower court proceedings, Appellants had already changed the name of their business from PayAirCargo to CargoSprint. Doc 169, ¶¶ 52-55. While there was evidence in the record of residual

---

[1] The facts referenced herein are limited to those from the underlying proceedings that bear on the legal errors outlined in this Appeal.

use of the old PayAirCargo name, Doc 354, p. 9-10, CargoSprint had mostly complied with a Settlement Agreement requiring that they transition to a new name, and to phase-out use of the old name. The Settlement Agreement permitted CargoSprint to notify all of their current customers *and* prospective customers of this name change. Doc 267, p. 11-12. The lower court noted that the Settlement Agreement permitted CargoSprint to include a notice on invoices to current customers, and on websites and social media, visible to both current and prospective customers, that the company would be changing its name to CargoSprint from PayAirCargo, Doc 169, ¶¶ 52-55, and that, "it certainly cannot be said that Defendants flagrantly disregarded the terms of the bargain." Doc 267, p. 12.

For a period of five (5) months, the Settlement Agreement permitted CargoSprint to create an association between the old name, PayAirCargo, and their new tradename, CargoSprint, to both existing customers as well as prospective customers and members of the general public. Doc 169, ¶¶ 52-55. PayCargo actively represented through the terms of the Settlement Agreement that it endorsed CargoSprint's continued use the PayAirCargo name on invoices from January 1, 2017, through May 31, 2017, alongside an explanatory note informing customers of the company name change. *See* Doc 169, ¶54. The explanatory note, "PayAirCargo has evolved! We are now CargoSprint.com," permitted on invoices

4

and elsewhere, contemplated a change of CargoSprint's name from PayAirCargo to CargoSprint, but it also permitted an association between the old name and the new name. Doc 169, ¶¶ 52-55. Leading up to, and during the pendency of, the lower court proceedings, CargoSprint continued to have residual uses of the old company name on social media and within html code, not readily visible to the public. Doc 169, ¶¶ 57-62; Doc 267, p. 12; Doc 354, p. 9-10.

Notwithstanding the terms of the Settlement Agreement, Appellee did not establish that it owns the PayCargo marks. Appellee repeatedly asserted ownership of U.S. Trademark Regs. 3,519,112 ("'112 Registration") 3,347,315 ("'315 Registration"), and 3,900,069 ("'069 Registration") (collectively, the "PayCargo Marks"). *See* Doc 169, ¶ 5. However, the evidence indicated that Appellee is not the owner of the subject marks because 1) the PayCargo Marks are generic, 2) the '112 and '315 Registrations were never assigned to Appellee from a third party entity, and were procured by fraud (applicable to Counts I and III), 3) the incontestable status of the '315 Registration was procured by fraud (applicable to Count III), and 4) the application for the '069 Registration was filed by a different entity than Appellee, was never assigned to Appellee from that other applicant along with the goodwill symbolized by the mark, and was procured by fraud (applicable to Count II). Doc 169, ¶¶ 5-30.

5

<u>The District Court's Findings, Trial Order and Final Judgment</u>

i.    <u>Genericism</u>

On June 4, 2021, the lower court issued its Order Denying Defendants' Motion for Partial Summary Judgment ("Order Denying Defendants' MSJ"), Doc 244, which opined that the PayCargo Marks are not generic, Doc 244, p. 7, finding, "Defendants' genericism argument is a repackaged version of its prior argument at the preliminary injunction phase that the mark is merely descriptive." Doc 244, p. 17. The lower court acknowledged that Appellants did submit for consideration at summary judgment evidence in the form of dictionary definitions and Appellee's patent registration, Doc. 244, pp. 5, 16-17, both of which evince that the PayCargo Marks are generic, or at the very least raise a material issue of fact regarding same. This evidence was not previously considered during the preliminary injunction hearing. The lower court seemingly assigned this evidence no weight, and instead referred to this evidence as "argument." Doc. 244, p. 17-18; Doc 267, p. 14.

Specifically, Appellants submitted evidence that the term PayCargo is composed of the words "pay" and "cargo." *Merriam-Webster Since 1928* defines "pay" as a transitive verb meaning, "to make a disposal or transfer of (money)," and "cargo" as a noun meaning, "the goods or merchandise conveyed in a ship, airplane, or vehicle." *See* Doc 244 p. 16-17. Appellants also offered evidence that Appellee asserted ownership of U.S. Patent No. 8,812,381 (the "'381 Patent") for

6

an "electronic cargo payment system." *See* Doc 169, ¶ 49; Doc. 244, p. 5, 17.
While the '381 Patent ownership claim is not a part of this appeal because
Appellee dropped the claim before trial, *compare* Doc 1 and Doc 100, the language
in the '381 Patent continued to be material evidence of genericness that the lower
court assigned no weight when it issued its Order Denying Defendants' MSJ, Doc
244, p. 17-18, and issued its Order on Plaintiff's Motion for Summary Judgment
("Order Granting Plaintiff's MSJ"). Doc 267.

In the registration for the '381 Patent, Appellee described the '381 Patent as
an "electronic cargo payment system" for "electronically and automatically
processing electronic payments for goods shipped by carriers for shippers." Doc
169, ¶ 50. The dictionary definitions and the patent registration, when read
together, are material evidence of genericism of the PayCargo Marks, despite the
lower court summarily finding that they were not.

    ii.   <u>Ownership Rights in the PayCargo Marks</u>

Coihue LLC ("Coihue"), the entity that filed the trademark applications for
the '112 Registration and the '315 Registration (collectively, the "Coihue
Registrations"), did not assign the PayCargo Marks to Appellee through the
Limited Liability Company Agreement of PayCargo, LLC (the "LLC
Agreement"), dated November 20, 2008. *See* Doc 169, ¶¶ 12-22. The lower court
disregarded the following undisputed facts that show that Coihue never assigned

the referenced marks to Appellee: 1) The Coihue Registrations were issued to Coihue by the United States Patent and Trademark Office ("USPTO") on October 21, 2008 and December 4, 2007, respectively. *See* Doc 169, ¶¶ 7, 10; 2) The USPTO issued the Coihue Registrations to Coihue before the LLC Agreement was fully executed. *See* Doc 169, ¶ 16; 3) The LLC Agreement does not include, or expressly reference, the Coihue Registrations. Doc 169, at ¶ 13; 4) The LLC Agreement does not include or expressly state that Coihue assigned ownership of the Coihue Registrations, *or any other trademark*, to Plaintiff. *See* Doc 169, ¶ 14; 5) The LLC Agreement defines "Coihue Intellectual Property," as any and all pre-existing intellectual property rights owned by Coihue at the time of the LLC Agreement, which included the Coihue Registrations. *See* Doc 169, ¶¶ 15-16; 6) The definition of "PayCargo Intellectual Property" in the LLC Agreement expressly excludes "Coihue Intellectual Property," as that term is defined in the LLC Agreement, Doc 169, ¶ 17; and 7) The LLC Agreement states that Coihue shall retain its rights in any intellectual property owned or licensed to it. Doc 169, ¶ 18.

The unambiguous terms of the LLC Agreement demonstrate that ownership of the Coihue Registrations remained with Coihue, and ownership of these registrations has never been transferred to Appellee. Appellee, fully aware of its lack of proper grounds for claiming ownership of the Coihue Registrations, stated

8

that if the LLC Agreement did not "technically accomplish" the assignment of these marks, this transfer was accomplished through a *Nunc Pro Tunc* Assignment ("*NPT*") between Coihue and PayCargo executed two years later. *See* Doc 169, ¶ 22. The *NPT* stated that its effective date was November 20, 2008, the date of the LLC Agreement, and the date Appellee alleged, without supporting evidence, that the Coihue Registrations *were previously* assigned to PayCargo. Doc 169, ¶ 21. However, no assignment of the Coihue Registrations ever occurred through the LLC Agreement in 2008. Therefore, there was no prior assignment back to which the *NPT* could refer and date. Nevertheless, the lower court found that the assignment of the Coihue Registrations was effective. Doc 244, pp. 9-10

Similarly, the entity that originally filed the application for the '069 Registration was PayCargo, LLC, *a Florida entity*. Doc 169, ¶ 24. Appellee is a Delaware limited liability company, *not a Florida entity*. *See* Doc 169, ¶ 25. These two entities are not the same. Before issuing the '069 Registration, the USPTO examining attorney entered, without explanation, an examiner's amendment changing the owner of the referenced application from the Florida entity to Appellee. Doc 169, ¶ 26. Appellee provided no evidence that an assignment of the application, together with the goodwill associated with the mark, for the '069 Registration, ever occurred from the Florida entity to Appellee. The lower court found, without supporting evidence, that this was a typographical mistake,

9

corrected by the USPTO, not requiring a formal assignment of the mark and the goodwill of the business. Doc 244, p. 11.

    iii.   <u>Fraud</u>

Coihue filed the application for the '112 Registration on August 27, 2007, representing to the USPTO that as of that filing date, the '112 Registration was being used in commerce in connection with all the services listed in the application. *See* Doc 169, ¶ 33. Coihue filed the application for the '315 Registration on March 13, 2007, similarly, representing to the USPTO that the '315 Registration was being used in commerce as of that filing date, in connection with all goods listed in the application. *See* Doc 169, ¶ 40. However, there was no evidence in the record that Appellee or Coihue provided *any* goods or services *in commerce* under the PayCargo Marks prior to 2009, years after the applications at issue were filed. In fact, all evidence in the record points to a date of first use in commerce of the PayCargo Marks no earlier than January 2009, nearly two years after the first application was filed. The statements made by Coihue were clearly fraudulent.

Appellee did not, and could not, truthfully represent that the '112 Registration or the '315 Registration were being used in commerce at the time of filing. In fact, Appellee admitted that these marks were not used in commerce at the time of filing of the applications, even though Coihue represented such to the

USPTO. *See* Doc 169, ¶ 44. Appellee's Chief Operating Officer, Juan Dieppa, testified that the first time a customer of Appellee was able to submit a request for payment of fees through the www.paycargo.com domain was on January 26, 2009. *See* Doc 169, ¶ 45. Prior to January 26, 2009, the PayCargo System was used only for test transactions. *See* Doc 169, ¶ 47. These test transactions did not result in the settlement of online freight transactions nor in the transfer of any funds. *See* Doc 169, ¶ 48.

Coihue was aware that it was not able to perform real (non-test) transactions within the PayCargo system in 2007. However, Coihue represented to the USPTO that the Coihue Registrations were in use in commerce in connection with *all* of the goods and services covered by the applications at the time of filing. *See* Doc 169, ¶¶ 33, 40. Coihue provided specimens to the USPTO that it knew failed to show use in commerce of the PayCargo Marks because it was "doing everything [] necessary to get – to get this passed." Doc 169, ¶ 37. Therefore, Coihue knowingly made false statements to the USPTO concerning the first use in commerce dates of these marks with an intent to deceive the USPTO. This was not an isolated incident. Appellee made additional knowingly false statements to the USPTO to overcome the December 7, 2007 Office Action which, had Appellee not provided substitute specimens and a Declaration that the marks were in use in commerce, *would have resulted in the abandonment* of the '112 Registration. Appellee's

11

fraudulent intent can be inferred from these circumstances because it knew it had not used the Coihue Registrations in commerce but nonetheless submitted an application based on use of the mark in commerce, and, when faced with abandonment of the application for the '112 Registration, made yet another fraudulent statement "to get this passed." Doc 169, ¶ 37. Notwithstanding this, the lower court found no material evidence in dispute and held there was no fraud. Doc 244, p. 15.

Regarding the '315 Registration, Appellee further misrepresented that the '315 Registration had been in continuous use in commerce for five (5) years when it filed a Statement of Incontestability with the USPTO on July 10, 2013. *See* Doc 169, ¶ 41. As discussed above, the PayCargo Marks were not used in commerce until January 26, 2009. *See* Doc 169, ¶¶ 44 – 45. Therefore, by July 10, 2013, the '315 Registration had only been in use for four (4) years, at most. Appellee was aware that the '315 Registration had not been used in connection with real (non-test) transactions until 2009, and therefore, it knew this mark was not eligible for incontestability. Further, with the aid of counsel, Appellee was aware that this filing would render the '315 Registration immune from certain defenses. *See* Doc 169, ¶ 41. However, the '315 Registration is not immune from cancellation due to fraud. Yet, the lower court found no fraud. Doc 244, p. 15.

The '069 Registration was also obtained fraudulently and should, therefore, be held invalid. In the application for the '069 Registration, Appellee represented to the USPTO that it was the owner of the Coihue Registrations. *See* Doc 169, ¶ 27. As discussed above, the Coihue Registrations were never successfully assigned to Appellee through either the 2008 LLC Agreement or the 2010 *NPT*. Knowing this, Appellee falsely represented to the USPTO that it was the owner of these prior registrations. Doc 169, ¶ 27. The lower court found no fraud. Doc 244, p. 15.

iv.    Trial

At trial, the lower court admitted evidence related to Appellants' profits. Doc 296. The lower court admitted evidence by Appellee in the form of excerpts of Appellants' SalesForce records, as well as Appellant's expert testimony. Doc 314, 163:1-8, 157:6-7; Doc 313, 29:24-30:5; Doc 287, Exhs. P-199-P-205. This evidence was received to show Appellants' revenues and cherrypicked costs. The expert testified that he knew that Appellee had subpoenaed Appellants' banking records but did not look at them to confirm whether expenses had been paid by Appellants. Doc 313, 28:25-29:1-7. Appellants subsequently advanced its bank records and the full SalesForce database that includes all of the sales, costs, and expense data of Appellee, and evidence that the expenses had actually been paid, D-94, D-95, D-275, D-276. Doc 313, 101:9-21; Doc 293, pp. 1-3. Appellee objected to the introduction of the SalesForce evidence, D-94 and D-95, which the

lower court sustained, Doc 313, 102:20-25, 103:1-17; Doc 293, p. 1-2, finding that

the exhibits were not admissible. Appellants proffered the following as to the

complete SalesForce database (D94 and D95):

Counsel:

> just so the record's clear, because plaintiff has already introduced
> portions of the Salesforce database, we would be entering it to,
> essentially, complete the statements and to provide a foundation for
> the profit and loss statements, which plaintiff has already advanced
> and is already an exhibit in the case. And to just short circuit an
> argument that there was an insufficient amount of data or evidence to
> support what our experts have relied–n -- our expert has relied on in
> proving deductions. That's the purpose for why we're trying to
> introduce it. I understand the Court's ruling.

Lower Court:

> 60 gigabytes of data does not demonstrate the sufficiency of the
> evidence. We kind of don't put it on a scale. There are going to be
> components, even as he has proffered and explained the database
> systems that are not going to be relevant, so they would not be
> admissible, for that reason alone. And to the extent this contains 60
> gigabytes of, potentially, 99 percent of irrelevant data, I have no way
> of quantifying its relevance. So to the extent there are pieces of it that
> are relevant and derived from Salesforce, I invite you to advance that.

Counsel:

> Those have been advanced by plaintiff, as well as the profit and loss statements, as well as the Azteca files.

Lower Court:

> Okay. My ruling is limited to 94 and 95.

Counsel:

> Yes, Your Honor.

(Defendants' Exhibits 49, 102, 103, 104, 105, 106, 107,108, 109, 110, 111, 112, 113, 136 are received in evidence.)

Doc 313, 102:20-25, 103:1-24. The court subsequently released Exhibits D-94 and

D-95 to counsel without consideration. Doc 306.

> Appellants proffered the following as to the banking records (D-275 and D-

276):

Counsel:

> Your Honor, these were all of the banking records that the bank had available when they were subpoenaed by the plaintiff. I can provide the exact dates, and I assume that this is the entire relationship, but I -- this is all the bank had available in response. This was a request for all of the banking records, essentially.

Lower Court:

> Okay. For what purpose is D-275 being advanced? What's the proffered relevance?

Counsel:

Yes. Mr. Mukamal testified multiple times that he did not see any proof that these expenses were paid. He had asked for proof, didn't receive it; then confirmed that he had, in fact, received these documents, just had not reviewed them.

.    .    .

He admitted they existed, but at the same time saying there's no proof that the expenses being paid. But they do prove that the expenses were paid. But to the extent that the Court needs to satisfy itself that the defendants have carried their burden of proving that the expenses have been paid in order for the expenses to be deducted, the evidence is there for the Court, and we would like to introduce it for that purpose. I understand the Court may not want to go through all of the documents, but the evidence will at least be there in the record to show that the expenses have been paid, which Mr. Mukamal testified those documents would show.

Doc 312, 7:13-25, 8:1-25; 9:1-6.

The lower court sustained the objection to the introduction of the bank records, finding that they contained both relevant and irrelevant information. Doc 312, 10:17-25; 11:1-8.

## STANDARDS OF REVIEW

This Court reviews a lower court's grant of summary judgment *de novo*. *OJ Commerce, LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1240 (11th Cir. 2022). "We review a summary judgment de novo." *Washington v. Howard*, 25 F.4th 891, 897 (11th Cir. 2022). The governing standard is by now well understood.

Summary judgment is only appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Id.* (internal quotation marks omitted). We view the evidence and all factual inferences therefrom in the light most

16

> favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant. *Id.* (internal quotation marks omitted).

*OJ Commerce,* 34 F.4th at 1240. This Court reviews rulings on admission of evidence for abuse of discretion. *Tambourine Comercio Internacional SA v. Solowsky*, 312 F.'App'x 263, 271 (11th Cir. 2009). Abuse of discretion arises when,

> the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact. *U.S. v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006) (quotation and citation omitted). Further, we will not reverse [the district court's evidentiary rulings] unless an erroneous ruling resulted in a substantial prejudicial effect. *Wright v. CSX Transp., Inc.*, 375 F.3d 1252, 1260 (11th Cir. 2004) (quotation and citation omitted).

"[D]istrict courts enjoy broad discretion in deciding how best to manage the cases before them." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997). "This includes a district court's ruling on the admissibility of evidence." *Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1305 (11th Cir. 1999). "[E]videntiary rulings will be overturned only if the moving party establishes that the ruling resulted in a 'substantial prejudicial effect.'" *Playnation Play Sys. v. Velex Corp.*, 859 F.'App'x 384, 386 (11th Cir. 2021)

The lower court's finding that a case is "exceptional," entitling a party to attorneys' fees, is reviewed for abuse of discretion. For a case to be "exceptional," it must be one that "'stands out from others,' either based on the strength of the

17

litigating positions or the manner in which the case was litigated." *Tobinick*, 884 F.3d at 1117. Although, "the district court has the discretion to determine whether a case stands out from others," it must be "based on the totality of the circumstances." *Domond v. PeopleNetwork APS*, No. 17-15576,2018 WL 4519930, at *2 (11th Cir. Sept. 20, 2018) (citing *Tobinick*, 884 F.3d at 1117).

## **SUMMARY OF THE ARGUMENT**

The district court erred when it granted partial summary judgment because it viewed the evidence in the light most favorable to Appellee (moving party), rather than CargoSprint (the non-moving parties), with respect to Counts I, II, III, and V. Docs 244, 267. The lower court also erred at trial when it sustained Appellee's objections to the introduction of Appellants' costs and expenses, 312, 10:17-25; 11:1-8; Doc 313, 102:20-25, 103:1-17, when offered to complete the writings introduced by Appellee. The lower court erred in its Trial Order when it ordered $15,191,277.50 in damages, having precluded CargoSprint from introducing into evidence its bank records and/or its SalesForce database to show proof that payments for costs and expenses were actually made. The lower court also erred by finding that this case is "exceptional," under the *Tobinick* standard.

The lower court incorrectly i) weighed evidence at the summary judgment stage, rather than determine whether there were genuine issues of fact in dispute as to genericism, ownership, fraud, equitable doctrines of estoppel, accord and

18

satisfaction, and fraudulent misrepresentation, and ii) at trial, considered only a portion of a SalesForce database that evinced revenues, but did not admit or consider that same evidence when determining deductions, and iii) made findings that were insufficient to award attorneys' fees.

The lower court decided genuine questions of material fact, which it should have left to a trier of fact to resolve. Specifically, there is a reasonable doubt about the facts with respect to the genericism of the PayCargo Marks, whether Appellee owns the PayCargo Marks, whether Appellee fraudulently registered the PayCargo Marks, and as a result whether equitable doctrines of estoppel, accord and satisfaction, and fraudulent misrepresentation applied. Such doubt should have been resolved in favor of the non-movant (CargoSprint). If the lower court was inclined to deny CargoSprint's MSJ, the lower court should have nevertheless denied PayCargo's MSJ as to Counts I, II, III, and V. At the very least, the case should have proceeded to trial on liability as to these counts, rather than only on damages and attorneys' fees as to these counts.

Summary judgment is inappropriate here, where the parties agree on some of the basic facts, but disagree about the inferences that should be drawn from these facts. "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296-97 (11th Cir. 1983). Although many

19

facts surrounding the registration and use of the PayCargo Marks are agreed, the inferences Appellee requested be drawn in its favor could very easily have been decided in CargoSprint's favor. Coihue and Appellee's actions during the application and registration process of the PayCargo Marks should preclude summary judgment. The dictionary definitions and patent registration evidence should have been considered by the trier of fact at trial, not weighed and decided at summary judgment. The trier of fact should have considered the equitable doctrines of estoppel, accord and satisfaction, and fraudulent misrepresentation in a trial on the merits of these counts.

The general rule is that the lower court's function at summary judgment is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. In any event, it was also error to order attorneys' fees in the lower court case. Continued residual use of the infringing name should not be the basis for a finding that the case is "exceptional." It is important to note that CargoSprint changed their name to CargoSprint even before the settlement agreement was finalized, and the residual uses found during the litigation, and which CargoSprint quickly resolved upon discovery, were not discovered readily by Appellee before the lawsuit was filed. Further, opposing a preliminary injunction is part of CargoSprint's due process rights, permitted by Fed. R. Civ. P. 65. Exercising a due process right, and then subsequently working

with the opposing party to craft a suitable order on Appellee's preliminary injunction motion, Doc 85, should not have been a basis for a finding that this case was "exceptional." It is also important to note that the residual infringing uses were not new uses. The old uses were discovered and quickly removed. This is not a basis for an exceptional case, despite the lower court having found CargoSprint in contempt for these inadvertent violations.

Any one of the district court's errors is sufficient for this Court to vacate the district court's summary judgment and trial orders and remand for further proceedings.

## **ARGUMENT**

### I. **The Lower Court Weighing of the Evidence Precludes Summary Judgment.**

The Order Denying Defendants' MSJ and Order Granting Plaintiff's MSJ clearly establish the existence of facts which preclude the entry of summary judgment due to CargoSprint's affirmative defenses. The lower court rejected CargoSprint's affirmative defenses in the Order Denying Defendants' MSJ, Doc 244, but first the lower court weighed the evidence, rather than making a finding that CargoSprint had failed to present any.

In addressing CargoSprint's affirmative defenses as to lack of ownership fraud, equitable doctrines of estoppel, accord and satisfaction, and fraudulent misrepresentation, the lower court again necessarily weighed the evidence. In

determining whether there was fraud on the USPTO, the lower court found that the explanations for why Appellee made knowingly false statements to be "misunderstandings" rather than fraud. Doc 244, p. 15. However, the lower court had sufficient material evidence in dispute before it, such that the lower court should have left these issues to be decided by a trier of fact at trial. The lower court clearly weighed evidence at the summary judgment stage. This was error. This Court should reverse and remand for further proceedings.

### A. Genericism

Trademark protection is only available to marks that are distinctive and are capable of identifying a source of goods and/or services. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768-69 (1992). A generic term, which "names a 'class' of goods or services, rather than any particular feature or exemplification of the class," is not eligible for trademark protection. *United States PTO v. Booking.com B.V.*, 140 S. Ct. 2298, 2304 (2020); *See also id.* at 2301. Whether a term is generic is based on its relevant meaning to consumers. *See id.* at 2304 ("Evidencing the Lanham Act's focus on consumer perception, the section governing cancellation of registration provides that '[t]he primary significance of the registered mark to the relevant public… shall be the test for determining whether the registered mark has become the generic name of the goods or services.'") (quoting 15 U.S.C. § 1064(3)).

22

Incontestable registrations are not immune from a genericness defense. *See Park 'n Fly v. Dollar Park & Fly*, 469 U.S. 189, 194 (1985) ("a registered mark may be canceled at any time on the grounds that it has become generic."). As such, a trademark registration provides a plaintiff only with a rebuttable presumption that the mark is not generic. If the presumption of non-genericness is sufficiently rebutted, the issue of cancellation must go to a jury. *See Klayman v. Freedom's Watch, Inc.,* 765 F. Supp. 2d 1348, 1355 (S.D. Fla. 2008) (quoting *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 935 (7th Cir. 1986)).

There are multiple ways a defendant can rebut the presumption with proof of genericness using documentary evidence. Pertinent examples include:

- Dictionary definitions, which "are significant evidence of genericness," *Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 810 (2d Cir.1999);

- Plaintiff's own generic use, which "is powerful evidence," *Welding Servs. v. Forman.*, 509 F.3d 1351, 1359 (11th Cir. 2007); *Loglan Inst. v. Logical Language Grp., Inc.*, 962 F.2d 1038, 1041 (Fed. Cir. 1992); and

- Generic use in patent language, *see, e.g., Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 407 (6th Cir. 2002); *Liquid Controls*, 802 F.2d at 938; *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 707 (1st Cir. 2007);

These examples of evidence relevant to the inquiry of genericness were summarized by the U.S. Middle District of Florida in *PODS Enters. v. U-Haul Int'l., Inc.*, No. 8:12-cv-01479-T-27MAP, 2015 U.S. Dist. LEXIS 29849, at *7-8 (M.D. Fla. Mar. 11, 2015); *See also Liquid Controls,* 802 F.2d at 937-38 (holding that the Plaintiff's LIQUID CONTROLS mark was generic after taking into consideration the evidence of dictionary definitions and information obtained from patent applications); *see also* Fed. R. Evid. 201. This Court recently held that district courts should not only consider dictionary definitions, but it may also take judicial notice of them without first affording the non-moving party a hearing. *See Robinson v. Liberty Mut. Ins. Co.*, 958 F.3d 1137, 1142 (11th Cir. 2020).

In addressing the defense of genericism, the lower court found that CargoSprint proffered dictionary definitions, a patent registration, and evidence of Appellee's own generic use of the mark relating to this defense,

> [w]hile Defendants acknowledge that registration is *prima facie* evidence that a mark is not generic, they seek to rebut that presumption by arguing that the dictionary definitions of the respective words "pay" and "cargo" reflects an inherent genericism in the term "PayCargo" (*id.* at 15). According to Merriam-Webster Since 1928, the word "pay" is a transitive verb meaning "to make a disposal or transfer of (money)," and "cargo" is a noun meaning "the goods or merchandise conveyed in a ship, airplane, or vehicle"; therefore, argue Defendants, the term "PayCargo" means "to make a disposal or transfer of (money)" for "merchandise conveyed in a ship, airplane, or vehicle," which they aver is generic because it simply describes Plaintiff and Defendants' line of business (*id.*). Defendants further argue that Plaintiff's 381 Patent, described as an "electronic cargo payment system," evinces that the marks are generic; the words "pay,"

24

"cargo," and other variations on those two words are used throughout the registration (*id.* (citing ECF No. 169 at ¶ 50)). Defendants argue that this demonstrates the Marks merely name the general goods and services provided by Plaintiff using the PayCargo system and are thus generic (*id.* at 16).

Doc 244, p. 16-17.

The Order Denying Defendants' MSJ, Doc 244, cites to *Booking.com*, 140 S. Ct. at 2304, stating that "a generic term is one that names a 'class' of goods or services and, for compound terms, the inquiry 'trains on the term's meaning as a whole, not its parts in isolation.'" Doc 244, 17. In *Booking.com*, one of the questions posed was whether ".com" when added to "booking" would be generic if "we might expect consumers to understand Travelocity—another such service—to be a "Booking.com." *Id. at* 2304-05. While the Supreme Court ruled that "generic.com" is not *per se* generic, as the USPTO rule required, *id. at* 2305, that does not mean that when combining "pay" and "cargo," two generic words in the cargo payment industry, the combination cannot be generic.

In contrast to *Booking.com*, where "[a] consumer who is familiar with that aspect of the domain-name system can infer that BOOKING.COM refers to *some* specific entity," *Id.* at 2306, there is no such exclusivity with companies who help customers to *pay cargo* fees. For example, "Because domain names are one of a kind, a significant portion of the public will always understand a generic '.com' term to refer to a specific business . . . ." the "exclusivity" of "generic.com"

terms sets them apart from terms like "Wine, Inc." and "The Wine Company" (internal citations removed). *Id.* Thus, "if 'Booking.com' were generic, we might expect consumers to understand Travelocity—another such service—to be a 'Booking.com.'" *Id. at* 2304-05. The Supreme Court did not find that to be the case, nor did it "expect that a consumer, searching for a trusted source of online hotel-reservation services, could ask a frequent traveler to name her favorite 'Booking.com' provider." *Id.*

Unlike in *Booking.com*, it is certainly reasonable for a consumer to ask a frequent cargo importer to name a company to help "pay air cargo" fees or ask which company can help to quickly "pay cargo" fees. Rather than consider what the Second Circuit deems "significant evidence of genericness," *Harley-Davidson*, 164 F.3d at 810, the lower court opined at summary judgment that the PayCargo Marks are not generic, Doc 244, p. 7, finding, "Defendants' genericism argument is a repackaged version of its prior argument at the preliminary injunction phase that the mark is merely descriptive." Doc 244, p. 17. Notably, the lower court acknowledged that Appellants submitted for consideration dictionary definitions, and Appellee's own patent registration, both of which tend to show that the marks are generic, or that raise a material issue of fact regarding same, Doc. 244, p. 16-17. The lower court had not previously considered this evidence at the preliminary injunction hearing. Doc 85. In any event, the lower court apparently assigned this

evidence no weight, and instead referred to this evidence as "argument" and discounted it, rather than treat it as "significant evidence of genericness." Doc. 244, p. 17-18; Doc 267, p. 14.

Appellants submitted evidence that the term PayCargo is composed of the words "pay" and "cargo." *Merriam-Webster Since 1928* defines "pay" as a transitive verb meaning, "to make a disposal or transfer of (money)," and "cargo" as a noun meaning, "the goods or merchandise conveyed in a ship, airplane, or vehicle." *See* Doc. 244, p. 16. Relevant to this analysis is that "pay" is a transitive verb, which is "characterized by having or containing a direct object." Doc. 244, p. 16. In other words, the word "pay" in the PayCargo Marks requires something on which for it to act. In this case, "pay" acts upon the word "cargo." The lower court incorrectly found that Appellants had considered the terms "pay" and "cargo" in isolation. Doc 244, p. 17. However, as discussed above, the terms must be read together. Therefore, the PayCargo Marks literally mean, "to make a disposal or transfer of (money)" for "merchandise conveyed in a ship, airplane, or vehicle." The PayCargo Marks literally name what PayCargo does in their line of business: help customers to "pay cargo" fees. As the Supreme Court in *Booking.com* stated, "[a] compound of generic elements is generic if the combination yields no additional meaning to consumers capable of distinguishing the goods or services."

27

*Booking.com*, 140 S. Ct. at 2306. That is clearly the case here, when a consumer is trying to quickly "pay cargo" fees.

While the above should have been enough to foreclose summary judgment in favor of Appellee on this issue, Appellants also offered evidence that Appellee asserted ownership of the "'381 Patent" for an "electronic cargo payment system." *See* Doc 169, ¶ 49. Courts have looked to language contained, not only in dictionaries, but in patent applications when evaluating whether a plaintiff's marks are generic, and have done so *at the summary judgment stage*. The Court in *Liquid Controls* took into consideration three patent applications that used the mark at issue, "liquid controls," when evaluating whether Plaintiff's mark was generic. *See Liquid Controls,* 802 F.2d at 938.

The lower court should have considered the dictionary definitions of the words "pay" and "cargo" also in view of how Appellee described the mechanism it uses in connection with the PayCargo Marks. Appellee not only described the '381 Patent as an "electronic cargo payment system," but included references to the words "pay," "cargo," and variations of related words and phrases (i.e., "payment," "*pay for cargo* shipments") when it described the '381 Patent throughout the registration. Doc 169, ¶ 51. The PayCargo Marks merely name the generic goods and services Appellee provides under the PayCargo System and because of this, the PayCargo Marks are generic. At the very least, the lower court should have

denied summary judgment as to genericness and permitted this evidence to be heard by the trier of fact at trial. Docs 244, 267. It did not. That was error.

There is no genuine dispute as to whether the PayCargo Marks are generic. Therefore, the PayCargo Marks are not entitled to protection and the lower court should have entered summary judgment in favor of CargoSprint as to Counts I, II, III, and V on this basis. Assuming, *arguendo*, that this Court does not find that the evidence supports a finding in favor of CargoSprint as a matter of law, it should at least make a finding that the evidence that CargoSprint averred at the summary judgment stage should have been sufficient to raise a material issue of fact, necessitating a reversal of the lower court's summary judgment orders. Docs 244, 267.

### B. Lack of Ownership Precludes Summary Judgment.

#### i. '112 Registration and '315 Registration (Counts I and III)

The 2008 LLC Agreement *never* assigned the Coihue Registrations to Appellee. *See* Doc 163, p. 5; 169, ¶¶ 12-22. Due to the LLC Agreement's failure to assign the Coihue Registrations to Appellee, the 2010 *NPT* never assigned these marks to Appellee either. Doc 169, ¶¶ 12-22. The *NPT* references the LLC Agreement as the prior assignment, which not only incorrectly labels the LLC Agreement, but also contradicts its language by declaring that an assignment through the LLC Agreement had occurred. *See Study Edge, LLC v. Skoolers*

*Tutoring Ctr.,* LLC, 2017 U.S. Dist. LEXIS 216268, at *9 (N.D. Fla. Dec. 8, 2017) ("[a]fter all, '[n]*unc pro tunc* implies the retroactive effect of a[n agreement], not the creation of a new [agreement].") Neither the LLC Agreement, nor the *NPT*, were effective in transferring the Coihue Registrations to Appellee. CargoSprint does acknowledge that *nunc pro tunc* assignments are appropriate in trademark cases. *See* Doc 174, p. 4. It is not CargoSprint's argument that Appellee lacks standing because the *NPT* in this case was filed or executed at an inappropriate time. Doc 178, p. 2. Rather, it was CargoSprint's position in the lower court that Appellee has no ownership rights in these marks, and therefore, lacks standing to sue. Doc 178, p. 2.

Nevertheless, Appellee persuaded the lower court to err in finding that Coihue, the entity that filed the trademark applications for the Coihue Registrations, assigned the referenced marks to Appellee through the LLC Agreement. *See* Doc 169, ¶¶ 12-22, Doc 244. The lower court erred when it disregarded the following undisputed facts that show that Coihue never assigned the referenced marks to Appellee: 1) The Coihue Registrations were issued to Coihue by the USPTO on October 21, 2008 and December 4, 2007, respectively. *See* Doc 169, ¶¶ 7, 10; 2) The USPTO issued the Coihue Registrations to Coihue before the LLC Agreement was fully executed. *See* Doc 169, ¶ 16; 3) The LLC Agreement does not include, or expressly reference, the Coihue Registrations. Doc

169, ¶ 13; 4) The LLC Agreement does not include or expressly state that Coihue assigned ownership of the Coihue Registrations, *or any other trademark*, to Plaintiff. *See* Doc 169, ¶ 14; 5) The LLC Agreement defines "Coihue Intellectual Property," as any and all pre-existing intellectual property rights owned by Coihue at the time of the LLC Agreement, which included the Coihue Registrations. *See* Doc 169, ¶¶ 15, 16; 6) The definition of "PayCargo Intellectual Property" in the LLC Agreement *expressly excludes* "Coihue Intellectual Property," as that term is defined in the LLC Agreement, Doc 169, ¶ 17; and 7) The LLC Agreement states that Coihue *shall retain* its rights in any intellectual property owned or licensed to it. Doc 169, ¶ 18.

As such, per the unambiguous terms of the LLC Agreement, ownership of the Coihue Registrations remained with Coihue, and ownership of these registrations was never transferred, and has never been transferred, to Appellee. Appellee, fully aware of its lack of proper grounds for claiming ownership of the Coihue Registrations, stated that if the LLC Agreement did not "technically accomplish" the assignment of these marks, this transfer was accomplished through the *NPT* executed two years later. *See* Doc 169, ¶¶ 12-22. The *NPT* stated that its effective date was November 20, 2008, the date of the LLC Agreement, and the date Appellee alleged, without supporting evidence, that the Coihue Registrations were assigned to PayCargo. Doc 169, ¶ 21. However, as discussed

above, no assignment of the '112 Registration or the '315 Registration ever occurred through the LLC Agreement in 2008. Therefore, there was, and is, no prior assignment back to which the *NPT* could refer and relate.

Either the LLC Agreement successfully assigned the referenced trademarks, in which case there would be no need to file the *NPT* with the USPTO two years later, or the LLC Agreement never assigned the marks to Appellee at all. Coming to this realization five (5) days before the filing of the application for the '069 Registration, Appellee attempted, to no avail, to cure this glaring chain of title defect by filing the *NPT*, which falsely stated that the Coihue Registrations were assigned by the LLC Agreement. *See* Doc 169, ¶¶ 30, 21. The lower court erroneously concluded that because the "*Nunc Pro Tunc* unequivocally states that '[a]ssignor hereby assigns and transfers *nunc pro tunc* as of November 20, 2008 to Assignee all right, title and interest in and to the aforesaid Trademarks . . ." that this "plainly evidences the intent to assign the marks to Plaintiff." Doc 244, p. 10. But the plain reading of the LLC Agreement precluded this, so the lower court's finding was not supported by the evidence and was error.

Therefore, there was no genuine dispute as to Appellee's non-ownership of the PayCargo Marks. The Court should, therefore, reverse and remand and order that the lower court enter summary judgment in favor of Appellants as to Counts I and III.

### ii.  '069 Registration (Count II)

Similarly, there was no genuine dispute that Appellee did not own the '069 Registration and, therefore, had no standing to sue for infringement as to this mark. The entity that originally filed the application for the '069 Registration was PayCargo, LLC, *a Florida entity*. Doc 169, ¶ 24. This was a real entity that existed at the time of the filing of the application for the '069 Registration. *Id.* This entity is not Appellee. Appellee is a Delaware limited liability company, *not a Florida entity*. *See* Doc 169, ¶ 25. Before issuing the '069 Registration, the USPTO examining attorney entered an examiner's amendment changing the owner of the referenced application from the Florida entity to Appellee. Doc 169, ¶ 26. However, this is not an effective means to transfer or assign intellectual property rights as there was no goodwill of the business included in this transfer. *See* McCarthy on Trademarks and Unfair Competition § 18:2 (5th ed.) ("The basic rule of trademark assignments is that a trademark cannot be assigned to another separate from the goodwill associated with the mark.").

According to 37 CFR 2.71(d),

[t]he applicant may amend the application to correct the name of the applicant, if there is a mistake in the manner in which the name of the applicant is set out in the application. The amendment must be verified. However, the application cannot be amended to set forth a different entity as the applicant. An application filed in the name of an entity that did not own the mark as of the filing date of the application is void.

Here, there was no amendment, much less a verified one. The application was filed in the name of a different, existing entity -- i.e., the wrong entity. Therefore, it was filed "in the name of an entity that did not own the mark as of the filing date" and the application should have been declared void.

According to Trademark Manual of Examining Procedure ("TMEP") §§ 803.06, 1201.02(b):

> An application must be filed by the party who is the owner of (or has a *bona fide* intention to use in commerce) the mark on the application filing date. *See* TMEP §1201. When an application is filed in the name of the wrong party, this defect cannot be cured by amendment or assignment.

*See also Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab.*, 859 F.3d 1023, 1027 (Fed. Cir. 2017) ("registration by one who did not own the mark at the time of filing renders the underlying application void *ab initio.*")

Appellee provided no evidence that an assignment of the application, together with the goodwill associated with the mark, for the '069 Registration, ever occurred from the Florida entity to Appellee. This is not a mere scrivener's error, akin to fixing a misspelling, as the lower court opined, because there was an actual Florida entity in existence at the time of the filing of the application. Doc 244, p. 11. Therefore, the Court should find that Appellee lacks standing as to Count II, reverse the lower court ruling, and order the lower court to enter summary judgment in CargoSprint's favor as to Count II.

34

There is no genuine dispute as to whether Appellee has any ownership rights in the PayCargo Marks. Therefore, CargoSprint requests reversal of the lower court, and that this Court order the entry of summary judgment in CargoSprint's favor as to Counts I, II, and III.

### C. Fraud on the USPTO Precludes Summary Judgment

Assuming, *arguendo*, the Court finds that there was a genuine dispute as to whether Appellee owned the PayCargo Marks, the entry of summary judgment in favor of Appellant was still proper as to Counts I, II, and III because there was no genuine dispute as to whether Appellee procured all three trademark registrations by committing fraud against the USPTO. In the alternative, this question should have been left for the trier of fact at trial when the credibility of the witnesses could be weighed.

In the trademark context, "[f]raud occurs when an applicant knowingly makes false, material representations of fact in connection with an application for a registered mark." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008) (quoting *Metro Traffic Control, Inc. v. Shadow Network Inc.*, 104 F.3d 336, 340 (Fed. Cir. 1997)). Fraud also requires a purpose or intent to deceive the USPTO in the application for the mark. *See Sovereign Military Hospitaller Order of St. John of of Rhodes & Malta v. Fla. Priory of the Knights Hospitallers of Sovereign Order of St. John of Jerusalem, Knights of*

*Malta, the Ecumenical Order*, 702 F.3d 1279, 1289 (11th Cir. 2012)). Deceptive intent can be inferred from circumstantial evidence. *See Spiral Direct, Inc. v. Basic Sports Apparel, Inc.,* 293 F. Supp. 3d 1334, 1359 (M.D. Fla. 2017) (quoting *In re Bose Corp.,* 580 F.3d 1240, 1245 (Fed. Cir. 2009)) ("'Of course, because direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence.'").

A court may infer fraudulent intent where a trademark owner knows that it has not used a mark in commerce yet still files a trademark application with the USPTO on the basis that the mark is already being used in commerce. *See Spiral Direct*, 293 F. Supp. at 1363; *See also id.* at 1361 (citing to *Nationstar Mortg. LLC v. Ahmad,* 112 U.S.P.Q.2d 1361 (T.T.A.B. Sept. 30, 2014)) ("Conversely, where a trademark owner knows that he has not used a trademark in commerce but nonetheless submits an application based on use of the mark in commerce, the Court may infer a fraudulent intent."). A mark procured by fraud is subject to cancellation *at any time*, notwithstanding incontestable status. *See Spiral Direct*, 293 F. Supp. at 1359.

### i. '112 Registration and '315 Registration (Counts I and III)

Coihue filed the application for the '112 Registration on August 27, 2007, representing to the USPTO, under penalty of perjury, that as of that filing date, the '112 Registration was being used in commerce in connection with all the services

listed in the application. *See* Doc 169, ¶ 33. Coihue filed the application for the '315 Registration on March 13, 2007, similarly, representing to the USPTO that the '315 Registration was being used in commerce as of that filing date, in connection with all goods listed in the application. *See* Doc 169, ¶ 40. However, there is no evidence in the record that Appellee or Coihue provided *any* goods or services *in commerce* under the PayCargo Marks prior to 2009, years after the applications at issue were filed. In fact, all evidence in the record points to a date of first use in commerce of the PayCargo Marks no earlier than January 2009, nearly two years after the first application was filed. Therefore, the Coihue Registrations are invalid, and this Court should reverse the lower court, and order the lower court to issue an order cancelling these marks.

Appellee did not, and could not, truthfully represent that the Coihue Registrations were being used in commerce at the time of filing. In fact, Appellee admitted that these marks were not used in commerce at the time of filing of the applications, even though Coihue represented such to the USPTO. *See* Doc 169, ¶ 44. Appellee's Chief Operating Officer, Juan Dieppa, testified that the first time a customer of Appellee was able to submit a request for payment of fees through the www.paycargo.com domain was on January 26, 2009. *See* Doc 169, ¶ 45. Prior to January 26, 2009, the PayCargo System was used only for test transactions. *See*

Doc 169, ¶ 47. These test transactions did not result in the settlement of online freight transactions nor in the transfer of any funds. *See* Doc 169, ¶ 48.

Coihue was aware that it was not able to perform real (non-test) transactions within the PayCargo system in 2007. However, Coihue knowingly and falsely represented to the USPTO that the Coihue Registrations were in use in commerce in connection with *all* of the goods and services covered by the applications at the time of filing. *See* Doc 169, ¶¶ 33, 40.

This was not the only evidence that supports Appellants' fraud contention. Something that the lower court appeared to not consider, Doc 244, p. 15, was that Coihue also provided specimens to the USPTO that it knew failed to show use in commerce of the PayCargo Marks because it was "doing everything [] necessary to get – to get this passed." Doc 169, ¶ 37. This is additional evidence that Coihue knowingly made false statements to the USPTO concerning the first use in commerce dates of these marks. This was clearly not evidence of "misunderstanding, an inadvertence, or a mere negligent omission," but rather it was evidence of an intent to deceive the USPTO, by getting one past it, in order to obtain a trademark registration. The lower court disagreed, but this was error.

This was not an isolated incident. Appellee made additional knowingly false statements to the USPTO to overcome the December 7, 2007 Office Action where, had Appellee not provided substitute specimens and a Declaration that the marks

38

were in use in commerce, would have resulted in the abandonment of the '112 Registration. Doc 169, ¶ 37. An applicant's statements concerning whether an applied-for mark is being used in connection with the goods and services covered in the pending application is a central statutory precondition to the issuance of that registration. *See* 37 C.F.R. § 2.34 (2021) (The requirements for an application under section 1(a) include the "applicant's verified statement that the mark is in use commerce."). Appellee's fraudulent intent can be inferred from these circumstances because it knew it had not used the '112 Registration or the '315 Registration in commerce but nonetheless submitted an application based on use of the mark in commerce, and, when faced with abandonment of the application for the '112 Registration, made yet another fraudulent statement "to get this passed." Doc 169 at ¶ 37; *see Spiral Direct,* 293 F. Supp. at 1361 (citing to *Nationstar Mortg.,* 112 U.S.P.Q.2d at 1361). While Appellee successfully got one past the USPTO, and apparently the lower court as well, this Court should not let Appellee get one past it.

Accordingly, the Court should reverse and remand with instructions to cancel these registrations and hold that Appellee holds no valid registrations concerning the '112 Registration or the '315 Registration. In the alternative, the Court should reverse and remand with instructions to have this issue decided by a trier of fact.

## ii.    Incontestable Status of '315 Registration (Count III)

Regarding the '315 Registration, Appellee further misrepresented that the '315 Registration had been in continuous use in commerce for five (5) years when it filed a Statement of Incontestability with the USPTO on July 10, 2013. *See* Doc 169, 41. As discussed above, the PayCargo Marks were not used in commerce until January 26, 2009. *See* Doc 169, ¶¶ 44 - 45. Therefore, by July 10, 2013, the '315 Registration had only been in use for four (4) years at most. Appellee was aware that the '315 Registration had not been used in connection with real (non-test) transactions until 2009, and therefore, it knew this mark was not eligible for incontestability. Further, with the aid of counsel, Appellee was aware that this fraudulent filing would render the '315 Registration immune from certain defenses. *See* Doc 169, ¶ 41. However, the '315 Registration is not immune from cancellation due to fraud. The Court should reverse and remand, and order the lower court to invalidate the incontestable status of the '315 Registration. Alternatively, the issue should be decided by a trier of fact.

Since Appellee's statement of incontestability for the '315 Registration was filed fraudulently, the incontestability status of the '315 Registration fails, rendering this mark void *ab initio*. When a mark has been on the Principal Register for less than five years, any ground that would have prevented registration in the first place qualifies as a valid ground for cancellation, including non-use of the

40

applied for mark in connection with the goods and services identified in the application on or before the filing date. *See Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009) ("The registration of a mark that does not meet the use requirement is void *ab initio*.") (*citing Gay Toys, Inc. v. McDonald's Corp.,* 582 F.2d 1067, 1068 (CCPA 1978)). In this case, it is clear that there was no actual use in commerce of the '315 Registration at the time Coihue filed the application on March 13, 2007. Accordingly, Appellee holds no valid or enforceable rights as to this mark. The lower court's findings to contrary were erroneous. This Court should reverse and remand.

### iii.    '069 Registration (Count II)

The '069 Registration was also obtained fraudulently, and therefore, this registration should be held invalid. In the application for the '069 Registration, Appellee represented to the USPTO that it was the owner of the Coihue Registrations. *See* Doc 169, ¶ 27. As discussed above, the Coihue Registrations were never successfully assigned to Appellee through either the LLC Agreement or the *NPT*. Knowing this, Appellee falsely represented to the USPTO that it was the owner of these prior registrations. *Id.* If not for these statements regarding ownership, the USPTO would have cited the Coihue Registrations against the application for the '069 Registration due to a likelihood of confusion. *See Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999)

41

(discussing the seven factors in assessing whether a likelihood of confusion exists between two marks, including the similarity of the mark and similarity between the goods and services provided under each mark).

Because there was no evidence in the record that Appellee obtained the PayCargo Marks without making fraudulent statements to the USPTO, and, indeed, only obtained the PayCargo Marks because of the material fraudulent statements, the Court should conclude that Appellee holds no valid registrations for the PayCargo Marks, reverse the lower court, and direct that summary judgment be entered in favor of Appellants.

### iv. Appellee's Breach of Contract Claim (Count IV) is also Barred

1. Count IV is Barred, In Part, by the Equitable Doctrines of Acquiescence and Estoppel

The equitable defense of acquiescence is available to a defendant who demonstrates that "(1) the senior user actively represented that it would not assert a right or claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; (3) the delay caused the Defendant undue prejudice." *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC,* 703 F. Supp. 2d 1307, 1314 (S.D. Fla. 2010) (citing to *SunAmerica Corp.* v. *Sun Life Ins. Co. of Canada*, 77 F.3d 1325, 1333 (11th Cir. 1996)). In order to successfully assert estoppel as a defense, a defendant is required to show "'(1) the party against whom estoppel is sought made a representation about a material fact that is contrary to a

42

position it later asserts; (2) the party seeking estoppel detrimentally relied on that representation.'" *Ford Motor Co. v. O.E. Wheel Distribs., LLC*, 868 F. Supp. 2d 1350, 1366 (M.D. Fla. 2012) (quoting *SourceTrack LLC v. Ariba, Inc.*, 958 So. 2d 523, 526 (Fla. App. 2007)).

Appellee actively represented through the terms of the Settlement Agreement that it would allow CargoSprint to continue to use the PayAirCargo name on invoices alongside an explanatory note informing customers of the company name change from January 1, 2017 through May 31, 2017. *See* Doc 169, ¶ 54. Appellee provided no sufficient reason for the delay in notifying CargoSprint of its concerns about what Appellee previously allowed during this time period. In fact, as this was a term included in the Settlement Agreement, it is clear Plaintiff had no issue with it. Instead, Appellee sought to punish CargoSprint for what was previously agreed upon between the Parties, thereby causing undue prejudice. Appellants, in accordance with the terms of the Settlement Agreement, generated CargoSprint invoices in compliance with this clause with the belief that this was acceptable to Appellee. *See* Doc, 169 ¶ 55. Appellee's breach of contract claim in Count IV was, therefore, barred, in part, with respect to CargoSprint invoices sent out from January 1, 2017 to May 31, 2017 that contained the PayAirCargo name alongside the explanatory note informing customers of the name change.

Appellee was also precluded from asserting that CargoSprint breached the Settlement Agreement during this time with respect to CargoSprint invoices by the equitable doctrine of estoppel. As discussed above, Appellee agreed to provide a transition period from January 1, 2017 through May 31, 2017 in which Defendants were permitted to include PayAirCargo on CargoSprint invoices. *See* Doc 169, ¶ 55. Appellee alleged that it was entitled to damages as a result of the use of the PayAirCargo name from the inception of CargoSprint (formerly PayAirCargo) in 2012, to 2019, which includes alleged damages from the transition period of January 1, 2017 to May 31, 2017. *See* Doc 169 ¶ 56. CargoSprint relied on Appellee's assertion that using an explanatory phrase on CargoSprint's invoices was acceptable and consequently, as discussed above, sent out these types of invoices. *See* Doc 169, ¶ 55. Therefore, in addition to Count IV being barred, in part, by acquiescence, this claim is also barred, in part, by estoppel with respect to CargoSprint invoices sent out from January 1, 2017 to May 31, 2017 that contained the PayAirCargo name alongside the explanatory note informing customers of the name change.

### 2. Count IV is Barred, In Part, by Accord and Satisfaction

Accord and satisfaction is the substitution of a new contract or agreement between the parties in satisfaction of a former one, and arises when the agreement is executed and satisfaction has been made. *See Air Products & Chem., Inc. v. La.*

*Land & Expl. Co.,* 806 F.2d 1524, 1528-29 (11th Cir. 1986) (quoting 10 Fla. Jur.2d *Compromise, Accord, and Release* § 1 (1979)). The elements under Florida law include, "(1) the parties intended to effect a settlement or resolve an existing dispute by entering into an agreement; and (2) the parties have engaged in actual performance in relation to the new agreement in order to resolve or settle the dispute." *Vencor Hosps. v. Blue Cross Blue Shield*, 169 F.3d 677, 682 (11th Cir. 1999).

On July 10, 2018, PayCargo sent CargoSprint a cease-and-desist letter regarding use of the PayAirCargo name on CargoSprint invoices. Doc 169, ¶ 57. In this same letter, PayCargo stated it did not wish to initiate litigation, *see* Doc 169, ¶ 59, and therefore gave Appellants the opportunity to cure. *Id*. Appellee's intent to resolve this dispute at that time is apparent because, (1) Appellee expressly stated that it did not wish to initiate litigation; and (2) Appellee gave Appellants the opportunity to cure. *See* Doc 169, ¶ 59. On July 25, 2018, CargoSprint responded to PayCargo's letter by e-mail representing that the alleged breach had been cured. *See* Doc 169, ¶ 60. This response demonstrated CargoSprint's intent to resolve the dispute. CargoSprint engaged in actual performance by curing the alleged breach, with the understanding that if CargoSprint fixed the issue, it would resolve Appellee's concerns without the need for litigation. CargoSprint received no further complaints from Appellee until almost a year later, on July 3, 2019. *See*

45

Doc 169, ¶¶ 61-62. PayCargo's engagement in actual performance of the new agreement came by way of no further complaints to CargoSprint after the 2018 alleged breach had been cured. Therefore, Count IV is also barred, in part, by accord and satisfaction with respect to CargoSprint invoices sent out between June 1, 2017, and July 25, 2018. These were the invoices referenced in PayCargo's July 10, 2018 letter and for which an accord was reached to the satisfaction of Appellee.

> 3. Appellee's Breach of Contract Claim in Count IV is Barred by Fraudulent Misrepresentation

Appellee's breach of contract claim in Count IV is also barred because Appellee made fraudulent misrepresentation to induce CargoSprint to enter into the Settlement Agreement. The four elements of fraudulent misrepresentation are:

> (1) [A] false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation. *Johnson*, 480 So. 2d at 627 (emphasis added).

*Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010). Here, CargoSprint entered into the Settlement Agreement, Doc 169, ¶ 52, only because Appellee had represented that it was the owner of trademark rights in and to the PayCargo Marks. As shown in these papers, *passim*, the Appellee did not, and does not, own the PayCargo Marks, knew that it did not own the marks when it entered into the Settlement Agreement with CargoSprint, and knew that asserting these false trademark rights would induce CargoSprint to enter into the Settlement Agreement. As a result of the

fraudulent misrepresentations, inducement, and reliance on same, CargoSprint's injury was self-evident by the lower court proceedings.

Therefore, Count IV is also barred by Appellee's fraudulent misrepresentation of its ownership in the PayCargo Marks. The Settlement Agreement was entered into by fraudulent misrepresentation, and the Court should reverse and remand with instructions to enter summary judgment in favor of Appellants as to Count IV on this basis. In the alternative, the Court should reverse and remand with instructions to have these issues decided by a trier of fact.

## II. The Lower Court Should Have Admitted Evidence at Trial of Costs and Expenses

This Court held in *Playnation,* 859 F. App'x at 386, "[d]istrict courts enjoy broad discretion in deciding how best to manage the cases before them." *See also Chudasama,* 123 F.3d at 1366. This includes a district court's ruling on the admissibility of evidence. *Cortes*, 177 F.3d at 1305. "[E]videntiary rulings will be overturned only if the moving party establishes that the ruling resulted in a 'substantial prejudicial effect.'" *Id.*

In calculating profits to be awarded to a plaintiff under the Lanham Act (applicable to Counts I, II, III, and V), profits are determined by the difference between gross revenue and any costs or deductions claimed by the defendant. 15 U.S.C.S. §1117(a). During its calculation of profits for the purpose of damages, the lower court relied heavily on the opinion of Appellee's damages expert, Barry

Mukamal. Doc 354, p. 11. The lower court accepted nearly all of Mr. Mukamal's determinations as to CargoSprint's net revenues while roundly rejecting the testimony advanced by CargoSprint's expert John Plumpe as to deductions and apportionment. Doc 354, pp. 11, 15. Mr. Mukamal's determinations as to revenue were based almost entirely on his review of profit and loss statements generated by the SalesForce database which contained records of the business transactions involving CargoSprint. Doc 314, 163:1-8, 157:6-7; Doc 313, 29:24-30:5; Doc 297, Exhs. P-199-P-205. Additionally, the lower court excluded the evidence presented by CargoSprint as to the costs to be deducted when calculating profits. Doc 354, p. 11. The exclusion, pertaining to $2.8 million in "invoices" reflecting payments made by CargoSprint for services, was a sanction against CargoSprint. Doc 354, p. 11. In the alternative, the lower court stated that the evidence was not reliable for the purpose of determining costs to be deducted from gross revenues. Doc 354, p. 11. This sanction arose from the Court's finding that CargoSprint had altered the "invoices" by removing the word "PayAirCargo" from them prior to production, as well as fixing typographical errors in the description of the entry. Doc 353.

Notwithstanding the lower court's sanction related to documents it did admit, the lower court had previously barred CargoSprint from submitting the entirety of the SalesForce database as evidence supporting these costs. Doc 313, 101:9-102:14. This appeal does not address the exclusion as a sanction by the

48

lower court of the individual "invoices," rather the exclusion of the complete database, which would have subsumed these invoices and would have been in their raw form as they were manually retrieved by Appellee during discovery. Doc 313, 101:9-102:14. In any event, by using the SalesForce evidence proffered by Appellee, the lower court implicitly accepted the values put forth by the SalesForce database for the purpose of calculating Appellants' revenue, but not for the purpose of determining Appellants' deductions. There was no justification for such an arbitrary distinction, and the lower court abused its discretion by excluding this evidence. This unfair ruling was contrary to Fed. R. Evid. 106, which should have required the introduction of the complete database. Indeed, permitting the entry of the SalesForce database would have resolved the issue of reliability and demonstrated that, while the individual "invoices" proffered by CargoSprint may have had alterations as to the name "PayAirCargo" and minor typo fixes, there was no evidence that the underlying financial data was changed. Doc 343, pp. 9-11. It would also have allowed the lower court to exclude the modified invoices, in accordance with the sanction, but also permit the inclusion of the data supporting the costs which CargoSprint rightfully sought to be deducted.

The lower court deprived Appellants of the ability to introduce the same form of evidence that Appellee relied on to prove revenues when it ordered $15,191,277.50 in damages. If there is a case that resulted in "substantial

prejudicial effect" by the exclusion of evidence, it is this one. The lower court abused its discretion by this arbitrary distinction. This Court should reverse and remand with instructions to either exclude all evidence of revenue from the SalesForce database, or to admit the full SalesForce database into evidence.

### III.    This Case is Not "Exceptional."

Under the Lanham Act, the lower court may only award attorneys' fees in "exceptional cases." "The Eleventh Circuit has traditionally interpreted the Lanham Act's exceptional case standard to allow for the award of fees 'only in exceptional circumstances and on evidence of fraud or bad faith.'" *Tobinick*, 884 F.3d at 1117. For a case to be "exceptional," it must be one that "'stands out from others,' either based on the strength of the litigating positions or the manner in which the case was litigated.'" *Id.* at 1118. Although, "the district court has the discretion to determine whether a case stands out from others," it must be "based on the totality of the circumstances." *Domond*, 2018 WL 4519930, at *2 (citing *Tobinick*, 884 F.3d at 1117).

Assuming, *arguendo*, that this Court does not reverse the lower court's Order Granting Plaintiff's MSJ, Doc 267, full stop, the district court still erred by finding that this is an "exceptional case," and awarding attorneys' fees in its Trial Order. Doc 354. The district court erred by ordering attorneys' fees in the lower court case where Appellee failed to establish an "exceptional case," when, at the

50

very least, 1) the basis for the lower court's finding that the case is "exceptional," is grounded, in part, on CargoSprint's opposition to Appellee's preliminary injunction motion, Doc 354, which is permitted by Fed. R. Civ. P. 65. This is particularly true where, as in this case, CargoSprint worked with Appellee in an effort to craft an agreement regarding the content of an order granting the motion, Docs 69, 85. "Following presentation of evidence, the hearing adjourned at the Parties' request for opportunity to confer regarding scope of relief requested by Plaintiff. Plaintiff has since moved for five specific categories of relief (ECF No. 79), two of which Defendants oppose (ECF No. 80)." Doc 85.

Additionally, a case cannot "stand out from others" merely because Appellee proves the elements of a count, so Appellants' continued inadvertent residual use of the old company name "for almost *four years* after Plaintiff demanded that they cease," cannot be a basis for finding the case is "exceptional." It is critical to note that the lower court found that "it certainly cannot be said that Defendants flagrantly disregarded the terms of the bargain." Doc 267, p. 12. If Appellants did not flagrantly disregard the terms of the bargain, it cannot be said that this case stands out from others.

This is not a case in which a nefarious actor knowingly and deliberately created new infringing uses and hid them from Appellee or the lower court. The continued uses were old Twitter posts, a single instance on a Facebook About

51

page, and the inclusion of an old PayAirCargo LinkedIn page in some employee email signature blocks, all of which were immediately removed upon their discovery. This is not a trademark infringement case that "stands out from the others," where the lower court acknowledged the link to the LinkedIn page "would be only visible in the metadata or HTML address of the page," and where the residual uses were,

> [a]ttributable to the Defendants' failure to adequately investigate and ascertain the numerous ways in which the name appeared in the market and to remove or change the name used by Defendants and others to identify Defendant CargoSprint in commerce; as well as their breach of agreement to set up an automatic reply to emails sent to support@payaircargo.com.

Doc 354, p. 10.

The totality of the circumstances does not support a finding that this case is exceptional. This Court should reverse and remand with instructions to strike the attorneys' fees award from the Trial Orders.

## **CONCLUSION**

In light of the lower court's abuse of discretion and misapplication of law, CargoSprint respectfully urges this Court to reverse the lower court, vacate the Order Granting Plaintiff's MSJ, Doc 267, the Order Denying Defendants' MSJ, Doc 244, Trial Order, 354, and Final Judgment, 366, and remand for further proceedings.

Respectfully Submitted,

*/s/ Noah H. Rashkind*

Ury Fischer
Noah H. Rashkind
Giulia C. Farrior
Dylan H. Smith
**LOTT & FISCHER, PL**
255 Aragon Avenue
Third Floor
Coral Gables, Florida 33134
(305) 448-7089

**Counsel for Appellants**

53

## **CERTIFICATE OF COMPLIANCE**

I CERTIFY that this brief complies with the type-volume limitation and typeface requirements of Fed. R. App. P. 32(a)(7)(B), because it contains 12,552 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman font.

s/ Noah H. Rashkind
Noah H. Rashkind

54

## CERTIFICATE OF SERVICE

I HEREBY certify that on this date, March 29, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and mailed seven copies to the Clerk of the Court via third party commercial carrier for delivery within three days. I also certify that the foregoing document is being served this day via CM/ECF on March 29, 2023.

s/ Noah H. Rashkind
Noah H. Rashkind

55